AO 91 (Rev. 11/11) Criminal Complaint

# UNITED STATES DISTRICT COURT

for the

Middle District of Florida

United States of America
v.
JOUSTIN ALFREDO OLIVO NICACIO

*Defendant(s)*

Case No.: 6:24-mj- 2076

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of July 2023 through June 2024 in the county of OSCEOLA AND ORANGE in the Middle District of Florida, and elsewhere, the defendant(s) violated:

| *Code Section* | *Offense Description* |
| --- | --- |
| 18 U.S.C. § 922(a)(1)(A) | Dealing in Firearms without a License |

This criminal complaint is based on these facts:

See Affidavit

☑ Continued on the attached sheet.

Vladimir D. Lena, Special Agent, ATF
*Printed name and title*

Sworn to before me over video conference and signed by me pursuant to Fed.R.Crim. P. 4.1 and 4(d)

Date: 10/15/2024

City and state: Orlando, FL

DANIEL C. IRICK
UNITED STATES MAGISTRATE JUDGE

**STATE OF FLORIDA** **CASE NO. 24-mj-**2076
2077

**COUNTY OF ORANGE** **FILED UNDER SEAL**

# MASTER AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT AND APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, Vladimir D. Lena, being duly sworn, depose and state the following:

1. I am employed as a Special Agent ("SA") in the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), United States Department of Justice, and have been employed in this capacity since December 2023. Prior to this, I was employed as a Customs and Border Protection ("CBP") officer for the Department of Homeland Security in Miami-Dade County, Florida, for nearly five years. I have completed all required training for ATF Special Agents at the Federal Law Enforcement Training Center.

2. During my employment as a law enforcement officer, my duties and experiences have included conducting firearms investigations, executing search warrants, enforcing any state or federal arrest warrants, enforcing all immigration law violations, preventing the illegal trafficking of people, narcotics, and contraband into the United States, conducting surveillance operations, and conducting interviews. I have participated in the investigations, arrests, and successful interdiction of individuals for violations of the various criminal statutes that ATF enforces. I also participated in a South American Theft Group ("SATG") operation with CBP, targeting individuals using immigration benefits to enter and commit crime in the United States.

3. The information contained in this affidavit is either based on my personal knowledge and observations, or information relayed to me by other law enforcement officers, including those acting in an undercover capacity. Information gathered during this investigation and intelligence provided by other law enforcement partners has been verified by physical surveillance and other investigative techniques. Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of a criminal complaint and search warrant, I have not set forth each and every fact learned during the course of this investigation.

4. As set forth in greater detail below and based on information and facts set forth in this affidavit, I have probable cause to believe that a crime has taken place, specifically that Joustin Alfredo Olivo Nicacio ("OLIVO") unlawfully engaged in the business of dealing of firearms without a license in violation of 18 U.S.C. § 922(a)(1)(A). Furthermore, I have probable cause to believe that OLIVO's cell phone ("DEVICE"), more particularly described in Attachment A, will have instrumentalities, contraband, and evidence of the crimes being investigated, as set forth in Attachment B. The DEVICE is currently in the possession of ATF and located at 3452 Lake Lynda Drive, Suite 450, Orlando, Florida, 32817.

5. This affidavit is submitted in support of a criminal complaint against OLIVO for violating 18 U.S.C. § 922(a)(1)(A) by unlawfully engaging in the business of importing, manufacturing, or dealing in firearms, or in the course of such business shipped, transported, or received a firearm in interstate or foreign commerce. This

affidavit is also submitted in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant to search the DEVICE described in Attachment A for the things described in Attachment B.

6. Based on my training and experience, I know that persons who sell firearms illegally often utilize cellular telephones and other communication devices/means to conduct their illegal transactions and to store contact information of their customers, suppliers, and related associates. Persons who sell firearms illegally also utilize these electronic devices to communicate with their customers, suppliers, and related associates through written text messages, various social media applications, and via oral telephonic communication. These cellular telephones and other communication devices/means are maintained within their residences, on their persons, and/or other locations over which they exercise dominion and control. Individuals associated with the illegal sale of firearms have utilized cellular telephones to facilitate their illegal activity throughout this investigation.

## STATUTORY AUTHORITY

7. 18 U.S.C. § 922(a)(1)(A) provides:

**(a)** It shall be unlawful--

**(1)** for any person--

> **(A)** except a . . . licensed dealer, to engage in the business of . . . dealing in firearms, or in the course of such business to ship, transport, or receive any firearm in interstate or foreign commerce . . .

## PROBABLE CAUSE

8. On September 26, 2024, ATF agents received a firearms trafficking lead generated as a result of 4 firearms that had been recovered in Parate Bueno, Columbia, during the course of a search warrant conducted by the Columbian National Police. The search warrant was conducted on the residence of a known Tren De Aragua ("TDA") International Criminal Organization/gang leader.

9. ATF conducted an eTrace query on all the recovered firearms.[1]

10. 2 of the firearms were Ruger, Model: 5.7, 5.7x28mm handguns bearing serial numbers "643-53619" and "643-53613" were purchased by C.W. on January 4, 2024. These 2 recovered firearms were also a part of a sale by C.W. wherein he purchased 10 of the same make and model firearms (Ruger, Model: 5.7, 5.7x28mm pistol) on January 4, 2024, from a Federal Firearms License ("FFL") in Ocoee, Florida. Both of the firearms were recovered at the aforementioned search warrant in Parate Bueno, Columbia, on May 5, 2024, 122 days after C.W.'s January 4, 2024, purchase. The purchase made by C.W. on January 4, 2024, for 10 Ruger, Model: 5.7, 5.7x28mm pistols also created a customer profile wherein C.W. provided his name, address, email, and phone number. This phone number is the same phone

[1] An ATF Trace Request report is a report generated from the recovery of a firearm that has been recovered from a crime scene, has been identified as stolen, or has otherwise been deemed the subject of a criminal investigation. The trace report includes information on the requestor of the trace, the original purchaser information (including name, date of birth, address and identification information), date of purchase, the Federal Firearms License ("FFL") information where the firearm was purchased, the firearm make, model, caliber and serial number (when/if applicable) and the recovery information to include date, location, possessor (when/if applicable).

number that was later seized from C.W. on October 2, 2024, pursuant to the firearm interdiction and interview of both C.W. and OLIVO.

11. In addition to the 2 Ruger pistols recovered in Columbia that were purchased by C.W., there were 2 additional Ruger, Model: 5.7, 5.7x28mm pistols bearing serial numbers “643-45009” (purchased by OLIVO on January 7, 2024) and “643-09357” (purchased by C.N.). Through the investigation, law enforcement officers discovered that C.W. employs OLIVO at his private security firm. C.W. is also friends with C.N. and speaks to both OLIVO and C.N. on a regular basis.

12. OLIVO purchased the Ruger, Model: 5.7, 5.7x28mm pistols bearing serial number “643-45009” on January 7, 2024, from a pawn shop in Orlando, Florida, and this purchase created a customer profile wherein OLIVO provided his name, address, and phone number. This phone number is the same phone number that was later seized from OLIVO on October 2, 2024, pursuant to the firearm interdiction and interview of both C.W. and OLIVO.

13. Through an eTrace database search and the collection of ATF Firearm Transfer Forms (ATF Form 4473s), ATF agents determined that from July 19, 2023, to September 10, 2024, C.W. had a total of 13 multiple sales reports associated with his name, accounting for 42 firearms, and an additional 30 individual firearms reflected on ATF Form 4473s. The total number of firearms purchased by C.W. from July 19, 2023, to September 10, 2024, is 72. Based on receipts gathered by ATF agents during this investigation, as well as fair market value, it is estimated that C.W. has spent approximately $52,000 on the purchase of the 72 firearms.

14. Law enforcement officers also found that from July 20, 2023, to June 6, 2024, OLIVO had a total of three 3 multiple sales reports associated with his name, accounting for 42 firearms, and an additional 30 individual firearms reflected on ATF Form 4473s.[2] The total number of firearms purchased by OLIVO from July 20, 2023, to June 6, 2024, is 72. Based on receipts gathered by ATF agents during this investigation, as well as fair market value, it is estimated that OLIVO has spent approximately $12,632.35 on the purchase of the 72 firearms.

15. On each ATF firearms transfer form (4473) that C.W. and OLIVO have completed, they have provided their address. C.W. provided his address in Orlando, Florida, and OLIVO provided his address in Kissimmee, Florida. Each of these forms require the purchaser/transferee/buyer to answer a series of questions and attest to the truthfulness of these answers. For example, Question 21.a reads as follows:

> Are you the actual transferee/buyer of the firearm(s) listed on this form and any continuation sheet(s) (ATF Form 5300.9A)? WARNING: You are not the actual transferee/buyer if you are acquiring any of the firearm(s) on behalf of another person. If you are not the actual transferee/buyer, the licensee cannot transfer any of the firearm(s) to you. Exception: If you are only picking up a repaired firearm(s) for another person, you are not required to answer 21.a and may proceed to question 21.b.

---

[2] The ATF Multiple Sales Report is a report mandated to be completed by the FFL conducting the sale and is generated when an individual purchases more than one firearm over the course of five business days from the same FFL. The report includes the FFL information where the firearms were purchased, the firearm make, model, caliber and serial number and the purchase date, and the purchaser information (including name, date of birth, address and identification information).

On each 4473 completed by C.W. and OLIVO, both checked the corresponding box denoting "Yes" in response to this question.

16. In addition to this question on the ATF firearms transfer form (4473), at the end of the questionnaire the following emboldened paragraph is written and requires a signature of the transferee/buyer:

> I certify that my answers in Section B are true, correct, and complete. I have read and understand the Notices, Instructions, and Definitions on ATF Form 4473. I understand that answering "yes" to question 21.a. if I am not the actual transferee/buyer is a crime punishable as a felony under Federal law, and may also violate State and/or local law. I understand that a person who answers "yes" to any of the questions 21.b. through 21.k. is prohibited from receiving or possessing a firearm. I understand that a person who answers "yes" to question 21.l.1. is prohibited from receiving or possessing a firearm, unless the person answers "yes" to question 21.l.2. and provides the documentation required in 26.d. I also understand that making any false oral or written statement or exhibiting any false or misrepresented identification with respect to this transaction, is a crime punishable as a felony under Federal law and may also violate State and/or local law. I further understand that the repetitive purchase of firearms for the purpose of resale to predominately earn a profit without a federal firearms license is a violation of Federal law.

C.W. and OLIVO both provided their signature and date on each of the respective 4473 forms they completed during each purchase they made.

17. On September 9, 2024, I placed a National Instant Background Check System ("NICS") flag on C.W., OLIVO, and C.N. In the event that C.W., OLIVO, and C.N. attempt to purchase a firearm from an FFL and a background check is conducted, the requesting agent will be notified.

18. On September 30, 2024, I was notified that OLIVO had his background check run by an FFL in Kissimmee, Florida. OLIVO does not possess a Florida concealed weapons or firearm permit, and therefore must wait three business days from the date of purchase to receive the firearms from the FFL. A check through the ATF Federal Firearms Licensing Center revealed that C.W., OLIVO, and C.N. have never applied for, or possessed, a valid FFL which would legally allow them to sell firearms.

19. On October 1, 2024, law enforcement officers with ATF and the Osceola County Sheriff's Office ("OCSO") conducted surveillance of an FFL in Kissimmee, Florida, in order to interdict the three firearms that OLIVO was scheduled to retrieve. Based upon the ongoing investigation, ATF agents had reasonable suspicion that the firearms OLIVO was going to retrieve were going to immediately be transferred to another person and/or trafficked. OLIVO did not arrive during the planned surveillance/interdiction operation on October 1, 2024.

20. On October 2, 2024, I and another ATF agent continued to surveil the FFL in Kissimmee, Florida, based upon the reasonable inference that OLIVO would arrive to take possession of the firearms. At approximately 3:30 p.m., a silver SUV with a dark tint, bearing Florida Registration B----R, arrived at the FFL. I positively identified OLIVO, and the vehicle registration was run through the Florida Driver and Vehicle Information Database ("DAVID") and showed the registered owner was C.W.'s private security firm. Due to the vehicle's excessive tint, I could not identify the driver.

21. The manager of the FFL sent a text message to an ATF agent conducting surveillance indicating that OLIVO had attempted to pick up three AK-variant rifles, but was not in possession of his Florida driver's license when he arrived. The FFL informed OLIVO that they could not transfer the firearms to OLIVO without his driver's license. OLIVO returned to the vehicle and the vehicle departed.

22. Law enforcement officers surveilled the vehicle until it parked at an apartment complex in Kissimmee, Florida. Visual surveillance was lost for a short period as the vehicle parked, but an ATF agent was able to observe OLIVO a short time later exiting the building and return to the front passenger side of the vehicle.

23. The vehicle returned to the FFL in Kissimmee, Florida, and after OLIVO reentered the FFL, he was observed a short time later walking out of the FFL with three AK-variant rifle boxes, placing them in the driver's side rear seat of the vehicle and getting back into the front passenger side. The vehicle was then surveilled as it made one stop and returned to the apartment complex. Once the vehicle parked and the occupants exited the vehicle and retrieved the firearms, law enforcement officers confronted and ordered the occupants to prone out at gunpoint. OLIVO and the driver, later identified as C.W., were detained in handcuffs based on the unknown possibility they may also be armed with firearms on their person. Law enforcement officers also seized both C.W.'s cell phone and OLIVO's DEVICE at this time.

24. Once both C.W. and OLIVO were patted down for weapons, they were separated. An ATF agent walked C.W. over to an awaiting ATF vehicle, and I escorted OLIVO to another vehicle. Both C.W. and OLIVO were asked is they would voluntarily consent to speak to agents within a vehicle away from the apartment complex to avoid any additional attention. Both C.W. and OLIVO agreed to speak with agents away from the apartment complex.

**OCTOBER 2, 2024, INTERVIEW OF OLIVO**

25. On October 2, 2024, ATF SA Gonzalez and I conducted a post-*Miranda* recorded interview with OLIVO for the purpose of investigating the circumstances a firearm OLIVO purchased being recovered in Colombia. SA Gonzalez read OLIVO his *Miranda* rights. OLIVO stated that he understood his rights and agreed to continue talking to us. During the interview, OLIVO stated that he recalled buying 15 or more firearms, and said that he has bought AK-type firearms, Tavors, and Glocks, but did not know what a Ruger or a Ruger Model: 5.7 pistol looked like. The firearm recovered in Colombia that was traced back to OLIVO's purchase on January 7, 2024, is a Ruger Model: 5.7 pistol with the serial number "643-45009."

26. OLIVO acknowledged that he was not currently working, but stated that he purchased all his firearms with his own money. It is also important to note that between July 2023 and June 2024, based on multiple sales reports, OLIVO had purchased a total of 16 firearms costing approximately $12,632.35, based on sales receipts and estimated value. At the time of the interview with OLIVO, however, ATF agents thought he had purchased as many as 18 firearms.

27. During the interview, when ATF agents asked OLIVO how many of the 18 firearms are his, OLIVO responded that "as of now I have only five that I currently own." OLIVO further stated that he has an AR-type pistol and an AR rifle in his apartment and that those firearms were purchased off the street, not from an FFL. OLIVO detailed that he also purchased a total of 6 firearms from Florida Gun Trader in addition to the one purchased from an FFL. When asked where the 18 firearms were, OLIVO stated that he had no idea. When asked who he gave those firearms to, OLIVO stated that he sold them. When asked who is giving him money to buy the firearms, OLIVO stated that despite the fact that he does not work a nine-to-five job, he does work and he works a lot with a security company.

28. OLIVO's statement contradicted the earnings and wages report on him, which revealed OLIVO has no reported income since November 2018. OLIVO further stated that on average he makes six to seven thousand dollars a month. He also admitted that he does not pay any taxes, which could partially explain the fact that there is no reported earnings and wage attributed to OLIVO, but would also to indicate that his potential employer is not reporting income for OLIVIO.

29. OLIVO stated that he was planning on going to the Dominican Republic on October 29, 2024. When ATF agents asked him again who gave him the money to buy the firearms and who he transferred those firearms to, OLIVO stated he does not transfer the firearms to a person. He stated he just puts the firearms in a box at an address that somebody tells him to, but OLIVO does not know who the person his.

30. Although OLIVO stated that he does not buy firearms to sell them, he made several statements that he buys guns to make profit. When ATF agents asked OLIVO what he did with the two firearms he purchased in January 2024, OLIVO replied that he sold the Glock a week later to a Puerto Rican guy and the Ruger to a friend of the person he sold the Glock to, but he does not know the names of the two people. When asked why he sold the Ruger firearm, OLIVO stated that it is because it does not compare to other firearms. When further asked why he keeps buying the Ruger Model: 5.7, OLIVO stated that it was to make a profit because it was "a hot gun."

31. When ATF agents asked OLIVO again if C.W. ever gave OLIVO money to buy a firearm, OLIVO stated that C.W. had not. OLIVO also stated that he never sold guns to C.W., but OLIVO acknowledged that he would give C.W. a gun and C.W. would give him money.

32. When asked if the Ruger firearm OLIVO bought in January was the same Ruger firearm he gave to C.W., OLIVO responded that it was, but OLIVO could not remember how much money he received from C.W. for the firearm.

**CONSENSUAL SEARCH OF C.W.'S CELLULAR DEVICE**

33. During his interview with ATF agents on October 2, 2024, C.W. provided agents with a signed Consent to Search Form (ATF Form 3220.11), and included the passcode for his black iPhone 14 Pro Max cellular phone.

34. On October 3, 2024, ATF agents conducted a preliminary search of C.W.'s cellular device. During the search, messages on December 2, 2023, between C.W. and OLIVO revealed that the two individuals were planning to "ship" a total of 6 Tavor-style firearms for a profit of $9,000.00 for each firearm.

35. ATF agents discovered conversations from December 7, 2023, between C.W. and OLIVO indicating that OLIVO has been to gun shows where people are selling firearms without conducting background checks. The conversations also revealed that OLIVO was able to obtain a Ruger firearm from an individual named "Corey." OLIVO further stated to C.W. in the messages that is what they needed.

36. ATF agents discovered additional messages from December 10, 2024, between OLIVO and C.W. which show OLIVO telling C.W. that they need to pick up the rifles by the following day and for C.W. to drop them off at OLIVO's apartment. Further messages show that when C.W. asked OLIVO what will happen if he does not get the other rifle, OLIVO replied that C.W. will make only $6,000.00 in profit. Other messages on the same day indicate that C.W. and OLIVO are purchasing firearms to ship to an unknown location.

37. ATF agents discovered additional messages from January 4, 2024, about individuals wanting firearms and C.W. stating that he can get "lowers" and "uppers" to build for a profit. Further conversations between C.W. and OLIVO on January 5, 2024, state that buying 10 AR-style firearms is less suspicious than buying 10 Model 5.7-style pistols.

38. ATF agents discovered an additional message from January 6, 2024, from OLIVO to C.W. stating that "we need to get this LLC/FFL and do it the legal way," which indicates knowledge that both C.W. and OLIVO knew that they need a license to manufacture and sell firearms.

## CHARACTERISTIC OF FIREARM TRAFFICKERS AND DEALERS

39. Based upon my training, experience, and participation in other firearm investigations, I know the following to be true about firearm traffickers and dealers:

a. Firearm traffickers and dealers maintain documents and other records or electronic devices used to facilitate firearm trafficking and dealing activities, including but not limited to ledgers, travel documents, bank records, address and telephone books, customer lists, and/or other papers containing the names, addresses, and/or telephone numbers of co-conspirators, in their residences, vehicles, sheds or other outdoor structures, and/or other locations over which they maintain control so that they have ready access to these items and/or to conceal such items from law enforcement, although such items may be in code;

b. Firearm traffickers and dealers maintain documents relating to the quantity, transportation, purchasing, ordering, sale, and/or distribution of firearms, although such language may be coded and such documents may be prepared in or contain code, and commonly maintain such in their residences, vehicles, sheds or other outdoor structures, and/or other locations over which the firearm trafficker and dealer maintain control so that they have ready access to these items and/or to conceal such items from law enforcement, and such are often

maintained for a period of time extending beyond the time during which they actually possess illegal firearms to keep track of firearm transactions, monetary transactions, firearm parts and component sources, and customers for future reference;

c. Firearm traffickers and dealers commonly maintain items used to manufacture, conceal, package, and distribute firearms within their residences, vehicles, sheds, and/or other outdoor structures and/or other locations over which they maintain control so that they have ready access to these items and/or to conceal these items from law enforcement authorities, and those items include but are not limited to:

- Manufacturing jigs, armorers tools (including but not limited to, punches, drills, drill bits, pliers, armorers blocks, and other hand tools), power tools such as drill presses, routers, lathes, CNC machines with accessories such as endmills, or router bits, instructions in both physical and digital formats, miscellaneous firearms parts and accessories, specialty armorers tools designed to serve specific weapons platforms such as "AR Wrenches," sight adjustment tools, and head spacing gauges;

- Record Keeping, Distribution, and Materials Packaging: ledgers, price lists, mailing supplies, packaging from ordered materials and supplies, catalogs, instruction manuals in both digital and physical formats, photographs of current and previous completed items in both electronic and physical forms; and

- Packaging and concealment: firearms carrying cases and bags, lockable containers designed to appear as items other than their actual intended purpose as a "gun safe" such as flags, tables, and clocks within their residences, vehicles, sheds or other outdoor structures, and/or other locations over which they maintain control so that they have ready access to these items and/or to conceal these items from law enforcement authorities.

d. Firearm traffickers and dealers commonly store firearms, firearm parts, and firearm accessories in secure locations, including within their residences, vehicles, sheds or other outdoor structures and/or other locations over which they maintain control so that they have ready access to these items and/or to conceal them from law enforcement;

e. Firearm traffickers and dealers commonly take, or cause to be taken, photographs of themselves, their associates, their assets, firearms, and other contraband or criminal activity, and they usually maintain these photographs in their possession, including within their residence, vehicles, sheds or other outdoor structures, and/or other locations over which they maintain control so that they have ready access and/or to conceal these items from law enforcement;

f. Firearm traffickers and dealers commonly maintain large amounts of U.S. currency used to finance their ongoing firearm business on their persons and/or within locations over which they maintain control, like their residences or vehicles, so that they have ready access to the currency and/or to conceal the currency from law enforcement. Firearm traffickers and dealers also commonly store proceeds of firearm sales, like U.S. currency, in secure locations, including within their residences, vehicles, sheds or other outdoor structures, and/or other locations over which they maintain control so that they have ready access to these items and/or to conceal these items from law enforcement;

g. Firearm traffickers and dealers must use telephones, usually cellphones, or other mobile or digital devices, to keep in constant communication with their criminal associates, including their suppliers and customers, and they usually maintain such devices in their possession, including within their residences, vehicles, sheds or other outdoor structures, and/or other locations over which they maintain control so that they have ready access to these items and/or to conceal these items from law enforcement. When firearm traffickers and dealers entrust a customer or associate with a method of contact, such as the number to a cellphone, this generally indicates that the firearm trafficker or dealers feels safe using that method of contact and, in all probability, will discuss his/her criminal activities with others through the same facility. Furthermore, it is common for firearm traffickers and dealers to possess, maintain, and utilize more than one cellphone to conduct firearm transactions in order to evade detection by law enforcement. It is also common for firearm traffickers and dealers to change their cellphone numbers frequently;

h. Additionally, firearm traffickers and dealers generally obtain large quantities of their illegal firearms or parts and components from foreign countries, and firearm traffickers and dealers involved in smuggling operations commonly keep their cellphone information concerning telephone records, visas, passports, letters, shipping receipts, wire transfer receipts, and so forth, which pertain to the obtaining, shipment, transportation, or payment for the illegal firearms.

i. Firearm traffickers and dealers obtaining firearms from foreign countries or other states may purchase the firearms through the dark web, which they may access through mobile and other digital devices with Internet access, such as mobile devices, laptops, or tablets like iPads;

j. Firearm traffickers and dealers frequently continue their illegal activity over months and even years;

k. Firearm traffickers and dealers typically obtain and distribute firearms on a regular basis, as any distributor of a legitimate commodity would purchase stock for sale. Similarly, such firearm traffickers and dealers will have an "inventory" which will fluctuate in size, depending upon the demand for and the availability of the product being sold. The records relating to such an inventory may be kept electronically within a firearm trafficker or dealer's cellphone(s);

l. Firearm traffickers and dealers commonly maintain documents, receipts, invoices, and other records relating to the purchase of personal items, firearms, telephones, and/or the payment of bills and other expenses in their residences, vehicles, and/or other locations over which they maintain control so that they have ready access to these items and/or to conceal such items from law enforcement;

m. Firearm traffickers and dealers maintain documents and other paperwork demonstrating or evidencing ownership, occupancy, and/or control over a location in that same location. For example, they maintain documents showing ownership, occupancy, and/or control over a residence, including, but not limited to,

rental or lease agreements, utility bills, telephone bills, cable TV bills. Firearm traffickers and dealers also may maintain documents showing ownership, occupancy, and/or control over a vehicle, including vehicle titles, registration, insurance documents, and/or rental agreements, in that same vehicle; and

n. Firearm traffickers and dealers often equip their residences with surveillance cameras to provide early warning of other criminals who would attempt to rob them or commit violence against them, and to provide early warning against law enforcement.

## TECHNICAL TERMS

40. Based on my training and experience, I use the following technical terms to convey the following meanings:

a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates,

appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For

example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f. IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

g. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

41. Based on my training, experience, and research, I know that the Device has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

42. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

43. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the Device because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

44. *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

45. Based on the above information, there is probable cause that from July 2023 to June 2024, in the Middle District of Florida, OLIVO unlawfully engaged in the business of dealing firearms without a license 18 U.S.C. § 922(a)(1)(A), and probable cause supporting a warrant authorizing OLIVO's arrest. There is also probable cause to support the search and seizure of OLIVO's DEVICE, more

particularly described in Attachment A, to seek the items described in Attachment B for evidence of the following offenses: unlawfully engaging in the business of importing, manufacturing, or dealing in firearms, or in the course of such business shipping, transporting, or receiving a firearm in interstate or foreign commerce, in violation of 18 U.S.C. § 922(a)(1)(A).

Respectfully submitted,

________________________________
Vladimir D. Lena
Special Agent, ATF

Affidavit submitted by email and
attested to me as true and accurate
by telephone or videoconference
consistent with Fed.R.Crim. P. 41(d)(3)
this 15th day of October 2024.

________________________________
DANIEL C. IRICK
UNITED STATES MAGISTRATE JUDGE